Before I get to the main arguments for why we thought the application of LSU's policies were invalid, both on their face and as applied to Dr. Buchanan, I'd like to identify three issues that I think make this case readily dispositive. First, the district court applied the wrong constitutional standard to our overbreadth challenge. The question in this case is whether LSU's policy would reach a substantial amount of speech that is protected by the First Amendment, not whether or not there is no set of circumstances under which the policy could be applied. Using the wrong constitutional standard is a reversible error, as the Supreme Court has identified in cases such as Reed v. Town of Gilbert, Expressionist Hair Design v. Schneiderman, and Sorrell v. IMS Health. Second, on the as applied challenge, the court failed even to conduct the required constitutional analysis because it erroneously concluded that Dr. Buchanan's speech was not protected by the First Amendment at all. That too is a reversible error. And third, that error flowed from a third mistake, and that is the court incorrectly said that there were no facts in the record regarding Dr. Buchanan's pedagogical purpose for her speech, and based its ruling on a credibility determination, thus violating the standard for deciding summary judgment, where the allegations of the complainant to be taken as true and all reasonable inferences are to be, the error is on the side of the plaintiff. I have a few procedural questions before we get to those merits issues you're addressing. Why didn't you sue the board? As I understand it, you know, there's all kinds of, there's a whole chain of events that rises up the level of the university, and then even, you know, getting to the president, but then it's ultimately, I mean, the termination is from the board. Why didn't you sue the board? Well, I think the argument would have been made that the board is a state entity, and the 11th Amendment precludes a suit against the board as an entity. But not for reinstatement on her next part, I mean, for a, not for the injunction. You're seeking an injunction to reinstate her, among other things, right? Yes, among other things. And so the board, well, who do you want, if you get that remedy, who do you want the injunction to issue against? I guess the university president, who has authority under the university policies PS36 to reinstate Dr. Buchanan. So an injunction and equitable relief would effectively provide that remedy. And there are a couple of reasons, just I think as a practical matter, why it wouldn't have made sense to sue the board as an entity. First, because of the 11th Amendment argument, but also because the argument would have been made we should have sued the board members individually, and their only action in this case was to follow the recommendations of the officials that we did sue. And in terms of the policy that was applied, getting to the merits of the board. One more procedural question. Perfect. If you succeed in showing it's facially unconstitutional, but if we agree with the district court that as applied to her, this speech was unprotected, and I know you disagree with that, but assume that world. Yes. Does she get her job back in that situation where that her speech was unprotected, yet the policy has these facial flaws? I think that where the university proceeds under a policy that is fatally flawed, that it would be difficult to conclude that she was fired for a constitutional reason, so that automatically the as applied challenge would also be effective, where the policy itself sets absolutely no guidelines for what speech is protected or how the university should proceed. Well, since you've raised it, I mean, it could wait till later, but we're on it. It seems to me that, again, as a matter of legal logistics, if we conclude that the determination on facial challenge was either improperly made or that you are successful on it, does that mean we cannot get to the as applied because the policy being applied is unconstitutional, or can we weave around what was unconstitutional and potentially find it? I mean, is it just in the issue, or do we still, do you think, have an opening to consider the as applied? If I understand your question ... I often don't explain it very well, but let's see what you understand. If the court decides that the policy is unconstitutional on its face, I think it still is necessary, or at least would be beneficial to decide the as applied challenge as well, if only in part because we're asking for reinstatement, but I think the two do go hand in hand, where you've got a policy that sets no discernible standards. It's hard to imagine how that policy could be applied in a constitutional way, and as the record in this case indicates, it certainly wasn't. Well, if we were to conclude her speech didn't enjoy First Amendment protection, then, right, then the as applied challenge would fail, but the policy might be defective for the reasons you note. It's possible to reach that result, and the Sixth Circuit did that in the Dambrock case where it found that the policy was unconstitutional, but the as applied challenge failed, but for reasons that are distinguishable in this case that I'll get to when I talk about the as As to the facial challenge, on the merits of that, the Court should invalidate LSU's policies as both overly broad and vague because an anti-harassment policy like this does apply a viewpoint-based regulation that is required to meet strict scrutiny. This is true on two different levels, and the policy is invalid on two different levels. First is a threshold matter. The scope of the policy has to apply and adhere to a constitutional standard as prescribed by the Supreme Court in Davis v. Monroe County Board of Education. It has to apply to speech only that is severe, pervasive, and objectively offensive. Here the policies PS73 and PS95 failed to meet that threshold test, but second, the terms of PS95 and PS73 failed to provide any kind of discernible standard. PS73, for example, gives examples of the kind of speech that can be regulated that includes quote sexually oriented behavior of an intimidating or demeaning nature. PS95 is even more lax. It applies to suggestive comments, offensive language, or display of sexually oriented materials or obscene gestures. Those by no manner of speaking can be defined as precise standards. Compare this, for example, if this were an obscenity case where you're trying to determine whether or not a regulation or a law can prohibit speech as being unprotected. As a threshold matter, it would have to meet the Miller test and the three-part test that the Supreme Court established in 1973, but secondly, the terms of the statute itself would also have to be precise. So in a case like that, you wouldn't be able to simply prohibit men's magazines or sexually oriented material. You would have to have precise terms of the statute as well as meeting the threshold test. Neither PS73 or PS95 meets those requirements. What would meet those requirements? What needs to be included or changed in the policy that would be precise and sufficient? Starting with the threshold, it would have to articulate that it meets the standard articulated in Davis, and that is it would focus on speech that is severe, pervasive, and objectively offensive. Here, the only mention of that comes in PS73, where it talks about meeting a reasonable person's standard. But there are a couple of problems with that. One is it doesn't also require that speech be severe and pervasive, and it also talks about how it can regulate any speech as a purpose or effect of having a discriminatory impact. Those are precisely the kinds of terms that were invalidated in cases like Sachs v. State College, Dijon v. Temple University, and Cawley v. the University of Virgin Islands. Secondly, we're talking about two policies here. So even if you can find some kind of objective test in PS73, it's negated by PS95 that has no such requirement. And we see how this was applied by the PS104 committee, which basically said they had no training in what kind of standard they were supposed to apply. They read it as an offensiveness standard viewed from the eye of the beholder, and so there was absolutely no guidance whatsoever and failed to meet that threshold test. But Judge Costa, to get to your specific questions, what terms should apply, I think that it's easier to identify the flaws rather than to try to write the policy for the school. And that's something the Supreme Court addressed in the United States v. Playboy Entertainment Group, where it said that you don't have to rewrite the law to meet the constitutional standards to know that it didn't meet the test. And here what we know is that the broad and expansive terms are precisely the kinds of terms that have been held unconstitutional again and again in the cases that we identified in both our main brief and in our reply brief. There have been no cases identifying policies of this kind that have held to be constitutional. And as a consequence, I think you can readily determine that these two policies failed to meet that test. Let me ask you on the role of this Court. On the facial challenge, if we agree, even though the district judge, I think, did set out the entire test in her opinion, when it comes to application of that to the facts, she did not apply the entire test to the facts, is this a matter for us then on de novo review to decide ourselves whether the facial challenge succeeds on the full application of the test or is it something we remand to her to make that initial decision? I think because this is de novo review, Judge Southwick, that the Court can resolve this matter without having to remand it. You can look at the facts of the record and determine that the policies themselves failed to meet the necessary constitutional test and reach a conclusion that it is unconstitutional. And you can look at the as-applied challenge and look at the facts of the record and determine that it is unconstitutional. I have a follow-up on that. If we were to do as you say and instead of remanding, take the test and apply the correct test, which you say the district court did not, can we then, if we find under the correct test that your client violated and is not protected, can we so rule? You could make a determination based on the facts that affirms the district court, but I think that would be a mistake in this case for at least three reasons. First, I think if you look at this Court's decision in El Paso Municipal Police Officers Association, the opinion for the Court by Judge Jones talked about the interplay of the First Amendment and anti-harassment laws and talked about how you have to have a heightened standard that, again, articulating what essentially is the same test as in the Davis test, that it has to be severe, pervasive, and it has to be objective. But it also said that in cases like this, you don't apply the law as if women are models of Victorian reticence. And more to the point said four printed derogatory references to an employee at irregular intervals in two and a half years do not evince sufficient hostility as a matter of law. I think that viewing this, the facts of this case through that lens, makes clear why, if you examine the record, there simply isn't the kind of showing that would justify a finding under the proper standards. And that's really the second part of that answer. That is, the district court violated its own the standard it laid down in looking at that, in talking about applying the ---- But even if you're right about all that, there has to be a severe and pervasive requirement. If we were to also conclude her speech, like asking or suppose a speech about asking students about their sex life, that that does not enjoy, warrant First Amendment protection, that's where I'm in trouble. Where would that situation leave us? Let me try and break that down. Because if you look at the facts of the record, the allegations in the record, they really fall into three categories, the occasional use of profanity, interactions with other school districts, which really form the main part of the school's findings, and then third, interactions with students. And that gets to the hypothetical, or at least the example from the record that you cited about talking to students. That, at most, was sporadic. And as the PS 104 committee found, most of that occurred during a period when Dr. Buchanan was going through a difficult divorce. What the school did, and this is precisely what happens when you apply vague and indefinite standards, they aggregated all of those. And then they would use, pick out an example, and say, well, this may cross the line. It didn't look at the body of these complaints and determine whether or not they fell even within the parameters of PS 73 and PS 95. But let's imagine a university without a harassment policy, and a teacher is swearing in class every day gratuitously, not related to the mission of the class. And they say, we're going to fire you. And to show that violates the First Amendment, you have to show that that was protected speech. That's right. And that's what differentiates this case from a case like Martin v. Parrish, where, and again, this is also a Judge Jones opinion, where it says, if you're simply going in and randomly swearing, then the school can take action. That is not the situation here. And in matter of fact — I know you disagree with that factually, but my point — why does it all turn on the policy? If in Judge Jones' case, they did say, I don't think there's a policy there. They just fired the person. And Judge Jones' opinion says that's not protected speech, so you have no First Amendment claim. Well, that's right. And in that case, she said he did not even make the argument that it was in service of any kind of pedagogical purpose, and therefore he has waived that argument. And in every other case where a university professor was using the speech in service of a pedagogical argument, including Kingsville Independent School District v. Cooper, Hardy v. Jefferson County, and Keith v. Giannakos, all of which we cite in our briefs — How is asking a student about her sex life have anything to do with teaching people how to be preschool teachers? Well, finding — again, that's what I'm saying. If you aggregate the complaints and then reach a generalized conclusion, that's one thing. But if you pick out a particular example, even if speech may have been ill-advised or rude during a difficult period in Dr. Buchanan's life, that by itself doesn't meet the standard that Judge Jones articulated. It's revealing to realize that Judge Jones wrote both the opinion in Martin v. Parrish and then nine years later, in DeAngelis, where she said that three or four examples don't meet the standard and that you can't simply treat women in the workplace, or in this case the educational environment, as models of Victorian reticence. So even if you can find one or two — Do you think that her gender had anything to do with what she received? No, I don't. And nothing was directed toward any of the students because of their gender. It so happened — You're talking about the LSU officials because of your client's gender. You were talking about Victorian models. Well, that was Judge Jones's language from DeAngelis because it was talking about — I understand that, but it sounded like you were saying they can't apply it to your client, and I didn't see anything where they had. I'm not sure I followed your question. You are just yes or no. You are not, or are you, saying that because of your client's gender, she was held to a higher standard? No, no, that's not our argument. We're arguing that — and if I could just finish my answer — we are arguing that under the prevailing standards for how Title IX must be applied, that the few examples that were plucked out of the record don't meet that test. All right, Kevin. May it please the Court, Sherry Morris for the appellees. Before getting into my argument, I just want to address some of the questions that have been asked this morning and some of the responses that were given. Opposing counsel wants to say that these were few isolated incidents, but that's not what the record shows at all. The difference between this case and some of the other cases that have been cited is that this faculty member enjoyed tenure. She was appointed by the Board of Supervisors. She was granted tenure and it's only the Board of Supervisors, Judge Costa, that can take away that tenure. None of my clients, who are the defendants in this action, had the authority to terminate a tenured professor. So before the termination of Dr. Buchanan, there was a procedure under Policy 104, which was attached to the complaint. PS 104 is a process that sets forth the procedures for terminating a faculty member for cause. And that process is very similar to the process that's used by the courts to decide not only civil cases but criminal cases and is also used by administrative agencies. Dr. Buchanan's actions were evaluated by a jury of her peers, if you will, five tenured faculty members who listened to 12 hours of testimony. This all occurred after an investigation was launched by the university after receiving numerous student complaints. In the fall of 2013, Dr. Curry, who was the acting interim associate dean, received complaints from two students. She met with those students, got the details of the complaints, and before she could even report that to the dean, she received a phone call from a school superintendent at one of the local school districts where student teachers are assigned. And he advised Dr. Curry that Dr. Buchanan was banned from the campus, that she could no longer supervise students within that jurisdiction. Dr. Curry was kind of new to this position, and so she took this information to the dean, Damon Andrew, who was also pretty new to his position. And they began to research, and they found out that there had been numerous instances of Dr. Buchanan being banned from other school districts and student complaints. So these were not isolated incidents that happened in the fall of 2013. The reports show that this behavior spanned a very long period of time. Within her job duties, Dr. Buchanan is required to supervise student teachers, and LSU has agreements with surrounding school districts where they place students who actually teach under the mentorship of a public school teacher. And as Dr. Buchanan, part of her role was to evaluate these teachers at the school sites in order to give them grades. Dr. Buchanan was banned from four school districts, making her unable to perform her job duties and placing the program in jeopardy. When it goes up the chain, they fire her based on violations of the sexual harassment policy, not on destroying this relationship with the school district or whatever else. If you read the documents that are in evidence on the motion for summary judgment, Dean Andrew details it began, first of all, after Dr. Curry collected all this information and Dean Andrew collected the information, they turned it over to human resource management. So there was an investigation by human resources where they actually interviewed people, and they learned from interviewing faculty members that these complaints of the students were very similar to prior complaints, to data that had been gathered during student surveys and surveys of the mentor teachers in the local school districts, and they put all this information together in the report. And then Gaston Reynoso, the investigator, turned that back over to Damon Andrew. And then it was at that point that Dr. Damon Andrew recommended a PS 104 hearing. And that is all detailed in his letter of request. All right, but they ultimately, this discipline was based on violations of the harassment policy, no? The discipline. Or the termination. The termination was by the Board of Supervisors. But what was available to the Board of Supervisors, what was available to the president of the university were all these documents that detailed evidence. Did it or did it not rely on a violation of the harassment policies that they're challenging? Yes, the harassment policies were cited. It seems to me that the whole thing was just you've ruined the relationship with this other school district. I mean, I don't think there would be a First Amendment issue, but there is because it says there was a violation of the harassment policies. As well. It's both cited. Also a violation of the student's privacy rights under the ADA. The faculty committee found, by clear and convincing evidence, that Dr. B. Hannon had violated both of the sexual harassment policies. What is the difference? I mean, I know 95 is harassment of students. I'm not quite clear. Is 73 just a general, like, applying if you harass faculty or staff? Is that the difference? Yes, Judge Costa. 73 is the general sexual harassment policy, and then 95 is tailored toward student harassment. But you have to read them together. But in this case, we're dealing with students that were in Dr. B. Hannon's classroom. There is no doubt that her speech was not protected. It was not related to the curriculum. Dr. B. Hannon's job was to teach teachers, teachers who would then go out with a degree to teach students aged 3 through 8, early elementary education. There's no doubt that her comments about condoms, personal sexual relationships, her son's sexual relationship, sexual relationships of students, has no relation to the curriculum that she was teaching. There is no doubt and no dispute that these comments were made by Dr. B. Hannon in the course of performing her duties that she was being paid for by the university. It occurred in the classroom. It also occurred on off-site campuses, which were really an extension of the LSU campus for the purpose of these clinical courses. Her demeaning remarks to female students about being pregnant or getting pregnant or having children or wearing certain clothes so they wouldn't look like a dyke, none of that has to do with the pedagogy or the curriculum that Dr. B. Hannon was hired to teach. And so her answer to the charges that were against her was simply, hey, that's part of my pedagogy. But the dean didn't buy that. The dean said, that doesn't even make sense. And that's why he went forward and requested the PS 104 hearing. But he requested the PS 104 hearing because he had no authority to terminate Dr. B. Hannon. The law is clear with respect to the damage claim that all four of the defendants are entitled to qualified immunity. They acted reasonably and they did not violate any clearly established rights of which a reasonable person should have known. Dr. B. Hannon was terminated by the Board of Supervisors on June 19, 2015. Three days later, on June 22, 2015, this court ruled in the matter of Cobertson v. Lykos, a case involving a governmental official who recommended termination and was facing a 1983 claim, that because the defendant was not the final decision maker and the law, there was case law holding that there could be no liability when someone who is not the final decision maker makes a recommendation that leads the plaintiff to being harmed, then that claim had to have been dismissed. This case is very similar to Cobertson. All of the individuals who I represent made findings or recommendations. None of them took the ultimate action to terminate Dr. B. Hannon because they were without authority to do so. What about President Alexander? President Alexander had no authority to terminate Dr. B. Hannon because she was tenured. And so his recommendation was made to the Louisiana State Board of University Supervisors. And so it was the Board of Supervisors that terminated Teresa B. Hannon on June 19, 2015. And to come to that conclusion, you need to look no further than the complaint. Paragraph 41 of the complaint states, on June 19, 2015, the Board of Supervisors dismissed B. Hannon. That's their allegation. The defendants admitted in the answer that the allegations of paragraph 41 are admitted. Also in support of that, on the motion for summary judgment, we filed the affidavit of A. G. Monaco, which attested to the fact that none of the four defendants had ever served on the Board of Supervisors. What about the answer that counsel opposite gave to Judge Costa's question about the as applied as opposed to facial? If we agree with everything you say, but she applied the wrong standard, can we decide that or do we have to remand? Or can we disregard it and do only as applied? I don't agree with opposing counsel's argument that the wrong standard was applied. He's looking for a very precise list. Answer his question first, and then you can deal with the merits of the issue. But if we agree that the wrong standard was applied, can you answer Judge Wiener's question? If the wrong standard was applied to determine that the policy was facially invalid, I believe that's a legal issue that this court can determine. That was not a factual issue. It was a legal issue. And I believe that this court can apply the correct standard. And if we determine that the wrong standard was applied, but that as applied here as opposed to facial, that the court was correct, what do we do about the facial impropriety? That's an interesting question. If there's no damage claim and there's no as applied, then the remedy with respect to the facial challenge is to declare it unconstitutional so it becomes unenforceable. But that would not impact the plaintiff in this case because she is no longer on the faculty or eligible to be on the faculty. But they would have relied on an unconstitutional policy in firing her. They also relied upon the violation of the ADA. Okay. And so how do we know which? She could be fired for either. Well, she could have been, but they cited both. So how do we know that the policy that in this hypothetical world we're talking about is unconstitutional wasn't what drove it? How do we know that? It doesn't matter what type of specific policy you had. Her behavior was so egregious. It wouldn't pass any standard. It's not related to her curriculum. It's totally offensive. Numerous student complaints over a period of years being banned from four school districts. How could she perform her duties if she can't even go to the school district? I get your argument, but clearly in the criminal context, for example, there are Supreme Court cases that say as applied, you know, you have no claim, but facially the statute's overbroad, violates the First Amendment, and so you're not convicted because the law is invalid that led to your conviction. Now, that's criminal. This is civil. I get it's different, but I'm wondering if it's not this similar here where, look, they cited this policy. If it turns out to be unconstitutional, what's the remedy? I guess in your criminal example, if they were convicted of multiple charges and one of them was unconstitutional, they would still have to face the other charges. It wouldn't eliminate all the charges. And here the penalty for a violation of federal law would be the same penalty. It could be the same penalty. But how do we know the board would have fired her if they weren't relying on the harassment policy? I don't guess that's anything that we could ever know. That's the difficulty. It is. It's difficult to separate all these issues because they're all intertwined. But I think we can't ignore the fact that there was a neutral arbitrator in this process that found by clear and convincing evidence, and these faculty members were bound by the terms of the same policies. And so the standard that they applied was, you know, offensive to a reasonable person, and they understood what that meant. The faculty committee could have certainly come back and said, we don't understand this or this is not clear. They did find, the faculty committee found that there was not enough evidence on the ADA violation. But that's a determination that F. King Alexander made, that there was enough evidence on the ADA violation. F. King Alexander relied upon the faculty committee, and the faculty committee was not selected as a defendant either. So the plaintiff went through the process. There were numerous people involved in this process, but hand-picked for defendants. And these defendants are simply not the ones that had the authority to terminate Teresa Buchanan. I would ask about another alternative. If we find that these defendants are entitled to qualified immunity because of the lack of clearly established, can we disregard everything else? Unfortunately, no. In the complaint, Dr. Buchanan seeks three forms of relief. One is compensatory damages under 42 U.S.C. 1983. She seeks declaratory relief. She wants both policies, 73 and 95, declared unconstitutional. And then she seeks an injunction. She wants reinstatement to her tenured position. And so the sovereign immunity eliminates the damage claims, but it doesn't necessarily eliminate the other challenges that she's brought forward. However, there are problems with the other challenges. The injunction is not sought against an individual that has the authority to reinstate Dr. Buchanan. She was terminated by the Board of Supervisors. None of these individuals have the right to override a decision of the Board of Supervisors. They didn't have— Also from that podium a little while ago said the opposite, that the board could terminate, but the president could reinstate. You disagree with that? The president doesn't have the authority to reinstate? Absolutely. Once the board—the Board of Supervisors is the only entity that can grant tenure, and they're the only entity that can take away tenure. Well, that's a legal question, it sounds like, on what the statutes controlling LSU say. The president of the university would have no authority to override— You have case law or a statute cited in your brief that shows us that? You'll have to cite it to us now because I'm not going to look it up now, but is it in your brief? I cited in my brief the provisions that create the Board of Supervisors and give them supervisory jurisdiction over the university and their officials. That's all cited in the brief. With two minutes left, I wish you'd address the facial challenge. You apparently pushed back on the concept that Judge Dick did not do the full analysis. Do you disagree that part of the necessary analysis on this challenge is whether a substantial number of its applications are unconstitutional, judged in relationship to the legitimate reach of the statute? Is that—do you agree or disagree that that's part of the necessary analysis? I believe the district court properly analyzed both the facial challenge and the as-applied challenge, and it is for that reason that I request the court to affirm. Well, I'm asking you a narrower question. What is part of the necessary test to decide whether this is a constitutional policy is whether a substantial number of its applications are unconstitutional in relation to its legitimate reach. Judge Dick actually said that in her opinion, but then never actually applied it to the facts. Are you saying it's not a necessary part of the analysis? I believe it's a necessary part of the analysis, but there's no evidence in the record to show that it's been applied in any other situation other than this one. There's nothing in the record that was produced by the plaintiffs to substantiate that argument. There are no facts. Okay. You can wind it up however you like. The summary judgment filed by the defendants should be affirmed. The ruling granted by Judge Dick after her very lengthy analysis of the cross-mission for summary judgment should be affirmed. All right, counsel. Thank you. In my remaining time, I'd like to address just a couple of quick points. First, as a factual matter, the allegation was made two or three times during the last few minutes that Dr. Buchanan had been found that she had violated the Americans with Disabilities Act. That is simply wrong in the record, and if you look at page 858 of the record, which is part of the PS 104 Committee's findings, it specifically states the charges of ADA violations were not substantiated by testimony. If you do a de novo review of the record as well, you'll find in the deposition of Karen Donnelly where she says that the student who said something about ADA was herself constantly talking about the reason for her accommodations in class, so it wasn't anything that had anything to do with Dr. Buchanan. So I thought it was important that we focus on what the case is really about, and those are the sexual harassment policies. This case is a prime example of where if the only tool that you have is a hammer, everything in the world begins to look like a nail, and so we're told that there are various reasons aggregated why Dr. Buchanan was terminated, with Ms. Morris focusing a lot on her relationships with other school districts, and this is a primary example of how these policies can be misapplied because they are so vague and nebulous. For example, the probably cornerstone complaint that was relied on by Dr. Alexander in terminating her, which led to the investigation in the first place, was the complaint by the Iberville School District and Ed Cancian, who complained basically that he thought that Dr. Buchanan had criticized the way his schools had run and didn't show him sufficient respect. He was so incensed he was going to call the police to keep her out of the school district. Now this got transmogrified into a sexual harassment complaint because part of what he said is she used the word, if you will excuse me, pussy three times. Never in a sexual context, never to do anything to harass students, but because that word can be used as slang in a sexual sense, that understanding got transmitted through the process to the point where it was the only one that Dr. Alexander could remember when he made his recommendation to the board. And so when you have a vague and amorphous process like this, which can aggregate all kinds of complaints that have nothing to do with sexual harassment, then you have this snowballing effect and this telephoning effect where you then rely on those aggregate conclusions to reach the wrong result. In this case, the director of the HRM office, Director Reynoso, said those relationships with other schools had nothing to do with his findings and had nothing to do with sexual harassment. Yet nevertheless, because you had these aggregate complaints simply listed in his report, those were then taken as findings and facts to be used by the higher-ups when they made their decision. I have no doubt you could talk about this for a good while longer, but your time is up. Thank you for your attention, Your Honors. Thank you both for elaborating on what your briefs had presented to us.